ALFA LAVAL SEPARATION, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Westfalia Separators, Inc., Intervenor–Defendant.

No. 97–536C.

United States Court of Federal Claims.

Jan. 23, 1998.*

---

* This opinion was issued under seal on January 14, 1998. Pursuant to ¶ 4 of the order entered on November 24, 1997, the parties were allowed five business days within which to identify protected/privileged material subject to deletion.

216

Victor L. Klingelhofer, Washington, DC, for plaintiff. Andew J. Mohr and Russell J. Gaspar, Cohen & White, of counsel.

Robert E. Leidenheimer, Jr., Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Anne M. Richard, United States Department of Justice, at trial, and Sandra D.B. Jumper, Department of the Navy, of counsel.

L. James D'Agostino, Washington, DC, for defendant-intervenor. Timothy B. Harris, Wickwire Gavin, of counsel.

### OPINION

MILLER, Judge.

This post-award bid protest case is before the court after trial. The protester seeks injunctive relief requiring the Government to terminate a contract to manufacture self-cleaning centrifugal purifiers. The issue to be decided is whether the procuring agency ignored mandatory requirements contained in the request for proposals.

### FACTS

Alfa Laval Separation, Inc. ("plaintiff"), manufactures and sells centrifugal purifiers, among other types of equipment.[1] For over 20 years, plaintiff has been the sole-source provider of centrifugal purifiers to the United States Department of the Navy (the "Navy"). As the sole-source provider, plaintiff has sold the Navy over 1,200 purification systems used on several different classes of naval ships.

In addition to serving as the sole provider of centrifugal purifiers, plaintiff also serviced the systems. The most significant component of the purifiers, known as the bowl assembly, requires regular maintenance. Over the past 20 years, plaintiff has, on a consistent basis, repaired the bowl assemblies on Navy destroyers at an average cost of over $67,000.00 per assembly. In 1996 plaintiff informed the Navy that certain purifiers on the DD963 class destroyers were beyond repair. Providing new bowl assemblies would cost $225,000.00 per purifier, plus an engineering fee of $72,000.00. In the alternative, plaintiff apprised the Navy that it could supply an updated model for approximately $350,000.00 per unit. Had the Navy

1. The purifiers filter stored oil before it enters a ship's propulsion system.

opted to procure updated purifiers from plaintiff, the cost would have been approximately $18.9 million. Rather than simply continuing the practice of using plaintiff as the sole-source provider, the Navy decided to investigate the possibility of opening the process up to competitive bidding.[2]

### 1. *History of the solicitation*

On August 23, 1996, the Naval Inventory Control Point, Mechanicsburg, PA ("NAV-ICP"), issued Request for Proposals (the "RFP") N00104–96–R–CE21 to procure up to 54 self-cleaning centrifugal purifiers. The purpose of this procurement was to enable the Navy to replace the antiquated purifiers located on Navy destroyers. The contract was to be awarded to the "responsible offeror whose offer conforms with all the requirements of the solicitation and whose evaluated price is low."

Opening the procurement to commercial manufacturers posed a significant challenge for the Navy. Because plaintiff had been the sole-source provider of the purifiers, no other commercial manufacturer had occasion to produce a purifier that would meet Navy specifications. As a consequence of this dilemma, the Navy drafted a unique and complex RFP.

Contained in the RFP were certain mandatory requirements with which an offeror had to comply in order to be deemed responsive. The requirements contained in the RFP addressed shock, vibration, noise, and performance testing. The intent of these requirements was to ensure that the purifiers would be able to withstand both the rigors of combat and of simply being at sea for long periods of time. Because it would be impossible for any manufacturer other than plaintiff to meet these requirements, the Navy included a mechanism in the RFP whereby

offerors could seek extensions of the mandatory requirements. Pursuant to these extensions, an offeror could supply test data taken from a baseline model that would allow the Navy's technical evaluation panel to determine that the proposed model would be able to comply with the mandatory requirements.

On December 4, 1996, NAVICP issued Amendment 0003 to the RFP, which addressed the Pre–Proposal Testing requirements and recharacterized them as Pre–Proposal Certification Requirements. Amendment 0003 stated, in pertinent part:

2.0 The offeror shall provide documentation certifying the following:

2.1 Shock Test:

2.1.1 Shock test data shall be provided by the manufacturer in compliance with the requirements of MIL–S–901C or MIL–S–901D for Grade A shock, Class I or Class II. An extension for shock test may be granted under the following conditions:

If the offered unit has been redesigned off the baseline model and the baseline model was satisfactorily shock tested in accordance with the requirements of MIL–S–901C or MIL–S–901D. Complete engineering design documentation referenced in paragraph 1.3 above shall be provided demonstrating that the redesigned Purifier model is capable of withstanding shock prescribed above.

2.2 Vibration Test

2.2.1 Vibration test data shall be provided by the manufacturer in accordance with the requirements of MIL–STD–167–1, Type I and Type II. Minimum frequency range for Type I vibration displacement shall be 4–15 Hz. An extension for vibration test may be granted under any of the following conditions:

a. If the offered unit has been redesigned off the baseline model and the base-

---

**2.** Defendant has suggested that one factor militating in favor of competitive bidding was the Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, ch. 140, § 8104, 108 Stat. 3390 (1994) (codified at 10 U.S.C. § 2377 (1994)). Pursuant to this statute, the Navy procurement officials were required

(b) to the maximum extent practicable—

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

. . . .

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items . . . .

line model was satisfactorily vibration tested in accordance with the requirements of MIL–STD–167–1. Complete engineering design documentation shall be provided demonstrating that the redesigned model is capable of withstanding both internally and externally induced vibration in accordance with the provisions of MIL–STD–167–1.

2.3 Airborne Noise Test:

2.3.1 The manufacturer shall submit documented airborne noise test data for the proposed model in accordance with MIL–STD–740–1. An extension for airborne noise testing may be granted under the following conditions:

a. Manufacturer's present documentation covering the airborne noise testing in accordance with DIN 45635, Part I, Class 2.

. . . .

2.5 Performance Certification

2.51 Performance acceptance test data of the Purifier offered shall be provided by the manufacturer and shall conform to the influent and effluent fuel requirements specified in the Purchase Description. An extension for the performance acceptance test may be granted under the following condition:

Extrapolated test data is submitted demonstrating that the offered Purifier model is capable of handling and processing fuel in accordance with the requirements of the Purchase Description.

In addition to the mandatory requirements set forth in the purchase description, the RFP also contained certain market acceptability criteria with which an offeror had to comply. These requirements provided:

7.0 Market Acceptability Criteria

7.1 The purifier is used in life threatening, life endangering situations in an extremely hostile and adverse environment. As such its performance and reliability in this usage cannot be compromised. The government does not possess the technical expertise necessary to design or described [sic] this equipment to ensure it will fulfill the critical performance and reliability parameters that define its use. The follow-

ing market acceptability criteria are necessary to document a valid data base proving the utility and reliability of the product to be provided under this purchase description.

—The company producing the item must have been producing the model being tendered under the solicitation or generically similar model for at least (10) years.

—The company must have produced at least (300) generically similar or identical models to that being tendered.

— The company must have produced at least (20) of the model(s) being tendered.

—The item offered must have been sold to the commercial market or the government. . . .

After preparing the RFP, NAVICP contacted six potential offerors. Only two submitted proposals—plaintiff, submitting three proposals, one of which it later withdrew, and Westfalia Separators, Inc. ("Westfalia" or "intervenor"), submitting one proposal. Westfalia is the U.S. subsidiary of Westfalia Separator AG, a corporation based in Germany that produces purifiers. Westfalia's proposal submitted a price that was $5 million less than plaintiff's lowest priced alternative and $10 million less than plaintiff's highest option.

After reviewing both plaintiffs and intervenor's respective proposals, NAVICP awarded Contract No. N00104–97–D–C812 (the "contract") to intervenor on July 3, 1997. The contract was for a term of five years and had a value of $13,711,543.00. Upon learning that NAVICP had awarded the contract to Westfalia, plaintiff sought a debriefing, which was conducted on July 8 and 24, 1997. Plaintiff subsequently filed a bid protest in the United States Court of Federal Claims.

The gravamen of plaintiff's suit is that the centrifugal purifiers that Westfalia has contracted to provide to the Navy fail to comply with the mandatory requirements set forth in the RFP governing shock, Type I and Type II vibration, airborne noise, and performance ability, as well as the RFP's market acceptability criteria. Had the Navy allowed plaintiff to bid a purifier that failed to meet the

mandatory requirements, plaintiff alleges that it could have proposed a lower price. By awarding the contract to Westfalia, plaintiff charges that NAVICP acted arbitrarily and capriciously and violated applicable procurement statutes and regulations.

## 2. *Summary of litigation in the Court of Federal Claims*

On August 8, 1997, plaintiff filed an application for a temporary restraining order and a motion for a preliminary injunction to enjoin the Government from acquiring centrifugal purifiers from Westfalia by means of the contract. The predicate for injunctive relief was NAVICP's disregard of the RFP's mandatory requirements, thereby acting in an arbitrary and capricious manner and in violation of applicable procurement statutes and regulations. In support of its application and motion, however, plaintiff failed to provide affidavits to buttress its contentions, basing each of its allegations on information and belief.

On August 13, 1997, a hearing was held at which the court had planned to review evidence on plaintiff's application for a temporary restraining order.[3] As of this date, the Navy had ordered eight centrifugal purifiers from Westfalia. The value of this order was approximately $1,893,000.00. Prior to the hearing, however, the parties had entered into an agreement whereby plaintiff would withdraw its application for a temporary restraining order and the Navy would neither place any further orders nor accept any previously ordered purifiers procured under the contract. At the hearing the parties informed the court of this agreement, which was memorialized in an August 14, 1997 consent order incorporating the parties' proposed terms and setting an expedited trial schedule.[4]

Plaintiff presented two witnesses at trial— Martin Quinones, a member of the Navy's technical evaluation panel, who was designated an adverse witness, and William D. Randall, Jr., who was qualified as an expert witness.[5] Plaintiff sought to elicit testimony demonstrating that the technical evaluation panel's grant of extensions to Westfalia, based on the data provided, was unreasonable. Plaintiff particularly was concerned with what it characterized as a relaxation of the Type II vibration testing requirement. Moreover, plaintiff alleged that as Westfalia had never before produced the OSB–35–02–366 purifier proposed, it could not have complied with the market acceptability criteria. On this basis, according to plaintiff, the award of the contract to Westfalia was arbitrary and capricious.

At the close of plaintiff's case, defendant and intervenor moved, pursuant to RCFC

---

**3.** While Westfalia had yet to intervene in the instant litigation, it had notified the parties that would soon do so. Westfalia filed a Motion To Intervene pursuant to RCFC 24 on August 14, 1997, which was granted on August 15, 1997.

**4.** Because the parties had informed the court that they did not consider this case amenable to a motion for summary judgment and that the court should hear testimony supplementing the administrative record, a trial was held. The court informed the parties that they must cite any pages of the administrative record that the court should consider in rendering its·decision. At the end of the day's proceedings, the court read into the record those pages cited by the parties, and at the close of trial the court offered each of the parties the opportunity to cite any additional pages. The court bases its decision only on those pages of the administrative record that were cited during trial or in the parties' briefs or that provide the court with context.

**5.** Defendant and intervenor disputed the qualification of Mr. Randall as an expert witness in engineering sciences—specifically, chemical engineering in relation to centrifugal purifiers. They argued that Mr. Randall was a chemical engineer offering his opinion to mechanical engineering questions, that he had limited experience with centrifugal purifiers, and that he had never personally observed or conducted testing in accordance with military standards. Although the court qualified Mr. Randall, he was limited to testimony purporting to demonstrate whether the data submitted on a baseline model can be extrapolated. Thus, he could testify on why the evaluation panel acted unreasonably in relying on the extrapolated data for a proffered model in granting Westfalia extensions of the shock, noise, vibration, and performance requirements. Mr. Randall was not permitted to "second-guess" the evaluators. Plaintiff's counsel represented that this limitation was in accordance with their planned examination of Mr. Randall. Moreover, the court noted that the witnesses' lack of direct experience with the topics in question would affect the weight accorded his testimony, which proved to be the case.

52(c), for a judgment on partial findings. The court orally granted this motion as to all issues other than Type II vibration testing and compliance with the market acceptability criteria. As to Type II testing, it was evident at the close of plaintiff's case that Westfalia had provided the Navy's technical evaluation panel with data of a different nature than that submitted for the other mandatory requirements. Although Mr. Quinones' testimony established that compliance with the market acceptability criteria did not depend solely on a particular purifier's alphanumeric designation, the court exercised its discretion in requiring trial to continue.

## DISCUSSION

■ In *GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 778–80 (1997), this court recently discussed the legal history of the jurisdiction to consider post-award bid protests. To obtain injunctive relief, a frustrated bidder is required to demonstrate by a preponderance of the evidence[6] that an agency's behavior was 1) without a reasonable basis, *see Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1153 (Fed.Cir. 1994), or 2) violated pertinent procurement statutes or regulations, *see CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988) (*per curiam*). The aggrieved party faces a higher burden in a negotiated procurement in which procurement officials are granted a great deal of discretion. *See Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980).

1. *Issues decided pursuant to RCFC 52(c)*

1) *The standards governing Rule 52(c)*

RCFC 52(c) provides:

If during a trial a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim, counterclaim, cross-claim or third-party claim that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

■ In the Court of Federal Claims, the judge is not only the arbiter of law, but also serves as the finder of fact. As a consequence of this dual role, a motion pursuant to RCFC 52(c) is not equivalent to the standard articulated in Fed.R.Civ.P. 50(a) governing a directed verdict. *See Persyn v. United States*, 34 Fed.Cl. 187, 194–95 (1995), *aff'd*, 106 F.3d 424 (Fed.Cir.1996) (Table). A judge of the Court of Federal Claims is not limited to determining whether plaintiff has put forward a *prima facie* case. Instead, the judge is permitted to weigh the evidence presented and is not required to settle questions of credibility in plaintiff's favor. *See Howard Indus., Inc. v. United States*, 126 Ct.Cl. 283, 289–90, 115 F.Supp. 481, 484–85 (1953). The Court of Claims provided a cogent explanation for this rule:

The so-called *prima facie* case rule governing the action of judges in jury trials rests upon the established division of functions, in such proceedings, between jury and judge, whereby the jury tries the facts and the judge determines the law. . . .

But in an action tried without a jury the judge is the trier of both the facts and the law. This fundamental distinction between jury and nonjury trials should not be ignored. . . . When a court sitting without a jury has heard all of the plaintiff's evi-

---

**6.** Although the Court of Federal Claims had decided pre-award bid protests for 14 years before jurisdiction was conferred to entertain post-award suits, the new legislation has caused angst to those who believe that the administrative record, which now is routinely filed in injunction cases, sets sacrosanct perimeters for judicial review. The administrative record is a *post facto* recreation of a procurement's documentary trail. If and when the administrative record does not, or cannot, serve to explain or defend a party's position, the record may be supplemented by other documents, including affidavits, or testimony. The concept is not revolutionary. *See GraphicData*, 37 Fed.Cl. at 779–80 (citing cases). In fact, as this case illustrates, both parties agreed that the challenged aspects of the procurement history could be illuminated only by trial. The administrative record helped to streamline the introduction of evidence, because all documents included therein that were cited during trial were deemed admitted. *See supra* note 4.

dence, it is appropriate that the court shall then determine whether or not the plaintiff has convincingly shown a right to relief. It is not reasonable to require a judge, on motion to dismiss under Rule 41(b) [predecessor to RCFC 52(c)], to determine merely whether there is a *prima facie* case ... sufficient for the consideration of a trier of the facts when he is himself the trier of the facts.... A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right under the due process clause of the Constitution, to hear the defendant's case, or to compel the court to hear it, merely because the plaintiff's case is a *prima facie* one in the jury trial sense of the term.

*Id.* at 289–90, 115 F.Supp. at 485–86 (quoting *United States v. United States Gypsum Co.,* 67 F.Supp. 397, 417–18 (D.D.C.1946), *rev'd on other grounds,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

### 2) *Shock testing*

The requirement governing shock testing obligated offerors to provide shock test data demonstrating compliance with military standard ("MIL") MIL–S–901C or MIL–S–901D. In the alternative, offerors could receive an extension for shock testing if they provided "complete engineering design documentation" that would allow the technical evaluation panel to extrapolate from a previously tested baseline purifier that the offered purifier would also meet the mandatory requirements applicable to shock. Mr. Quinones understood the solicitation to contemplate the granting of an extension for shock testing if the offeror provided sufficient data so as to permit the technical evaluators to make a sound decision based on their own engineering judgment.

No dispute is present that Westfalia had to obtain an extension in order to comply with the shock test requirement. Westfalia proposed to provide the Navy with purifier model OSB–35–02–366, although it had never before produced such a purifier. Therefore, Westfalia provided the Navy with test data applicable to its model OSA–35–02–366.

Westfalia maintains that the OSA–35–02–366 purifier was the baseline purifier from which the proposed purifier was derived and that the data provided from that machine were sufficient to convince the evaluators that an extension could be granted, so that the technical evaluation panel acted reasonably in granting an extension for shock testing.

Westfalia provided the evaluation panel with a certification stating that the OSA–35–02–366 purifier had been tested in accordance with MIL–S–901C and that the OSA model was the baseline from which the OSB was derived. In support of the certification requesting an extension for shock testing, Westfalia directed the evaluators to four different sections of its proposal: 1) Attachment A indicating the design differences between the baseline and offered purifiers; 2) Attachment B, which was the shock report for the baseline model; 3) Section I, a dimensional drawing; and 4) Section K, another dimensional drawing. Mr. Quinones testified that, after reviewing the information supplied by Westfalia, the panel determined that Westfalia was entitled to an extension of the shock testing requirement.

Plaintiff delved into the reasonableness of the evaluators' decision. As an initial point, plaintiff pointed to a February 7, 1997 letter in which the Navy informed Westfalia that it had "failed to identify the differences, in regard to extending shock qualification, from OSA–35–02–366, the model that passed MIL–S–901C shock testing, and the OSB–35–02–366, the model being proposed." Westfalia responded by letter dated February 14, 1997, directing the evaluators' attention to Attachment A and proposing a technical meeting. Such a meeting never took place. The February 14 letter also suggested that the Navy could award Westfalia the contract contingent on the OSB–35–02–366's passing a post-production shock test, or the Navy could accept the baseline model that been provided previously to the Canadian Navy. The Navy rejected both of these options.

Westfalia sent the Navy a second letter, dated February 26, 1997, providing supplemental information and promising to forward to the evaluators more legible design draw-

ings.[7] This letter addressed three potential areas of concern: 1) the pinion and worm gear, 2) the horizontal (worm wheel) shaft, and 3) the frame.

Plaintiff took the position that this submission could not clear up any shortcomings because Attachment A had mentioned nine differences.[8] Mr. Quinones testified that these three areas were those most directly related to whether the unit could pass the shock test.[9] He explained that the evaluators, from the outset, were concerned primarily with learning where in the unit the design improvements had occurred. The new drawings submitted by Westfalia contained blackened areas indicating the location of the improvements and satisfied the evaluators. Plaintiff also challenged specifically the differences concerning the centripetal pump and the number of discs. Mr. Quinones took the position that these areas were irrelevant to the question of shock.

The next area of dispute concerned the evaluators' decision not to test certain solenoid valves found in the proposed model. Plaintiff contends that ¶ 1.2.4 of MIL–S–901D requires testing of "principal units" that are defined as "items which are directly supported by the ship structure or by a foundation which is directly attached to the ship structure, and items mounted in piping systems, ducting systems, and similar systems which are supported by ship structure."[10] Valves may be deemed a "principal unit" if they are "installed in piping which is supported by ship structure."

While it is undisputed that the Navy did not require shock testing for the solenoid valves found on the OSB–35–02–366 purifier, a rational explanation was provided for its decision. Mr. Quinones stated that the shock test requirement only applied to the purifier unit as a whole, not to individual components. More specifically, the Navy required shock testing for "everything that's physically attached to the unit." Thus, because the solenoid valves were not attached directly to the purifiers, the evaluators did not consider them principal units subject to shock testing.

Plaintiff posits that, as the valves in question were attached to hangers that were eventually attached to the ship's structure, the evaluators should have required shock testing. This is nonsensical in that it would require the Navy to shock test every valve on board its ships. The military standard clearly contemplates testing some, but not all, valves. Mr. Quinones also put this line of argument to rest:

> Q [By plaintiff's counsel] Isn't it true that all piping is hung from pipe hangers?
>
> A [By Mr. Quinones] Yes.

7. The drawings submitted with the February 26 letter bordered on illegibility. Mr. Quinones testified that, at some point subsequent to the February 26 letter, the evaluators were provided with more legible drawings.

8. Plaintiff also inquired into how the evaluators could have made a reasonable decision based, in part, on the design drawings if they could not read the charts and notes printed on the drawings that were in German, Although Mr. Quinones admitted that he was not well-versed in the German language, he provided a cogent explanation addressing plaintiff's concerns:

> Q [By plaintiff's counsel] Now, this is a drawing of a schraubenradwelle, is it not?
> A [Mr. Quinones] I can't pronounce that word.
> Q Do you know if this is a drawing, though?
> A Yes, I do.
> Q What is it a drawing of?
> A That's a horizontal shaft of the purifier.

As Mr. Quinones testified: "I do not have an idea of the language [German]. I do have a big idea of what I'm looking at as far as an engineering drawing goes."

9. The drawings also allowed the evaluators to discern that the larger horizontal shaft on the proposed purifier would be able to withstand the greater torque to which the proposed purifier would be subjected. The increased capacity to handle torque is relevant because Mr. Quinones stated that torque is a variety of stress. Shock is also a variety of stress. If the shaft can handle more stress, it can also handle stress produced by shock. In evaluating the horizontal shaft's ability to handle torque, the evaluators considered the larger motor that would be incorporated into the proposed model.

10. In its request for an extension, Westfalia stated expressly that its baseline model had been tested in accordance with MIL–S–901C, not 901D. The solicitation stipulated that testing in accordance with either of these standards was sufficient. Nevertheless, the court will address this element of plaintiff's argument based on MIL–S–901D.

Q Well, then, what are they talking about on page 4018 [the military standard], valves installed in piping which is supported by ship structure?

A Yes, there are huge valves—huge valves—I mean, in orders of magnitude from which the ship gets its steering capability. Obviously, these valves have to be mounted to the ship's structure, but obviously, this is not the case here either, so.

As Mr. Quinones had explained previously that the valves in question were small valves that were eventually attached to the ship, the court cannot find that they are "principal units" that must be shock tested.

Plaintiff's expert, Mr. Randall, testified that the data submitted by Westfalia provided the evaluators with insufficient information on which to grant a shock test extension. This opinion was based primarily on the fact that the baseline purifier used a 25–hp motor, whereas the proposed purifier used a 30–hp motor. Mr. Randall described the motor as attached to the purifier by what he termed a "flange-type connection." According to Mr. Randall, the connection was cantilevered, meaning that the entire weight of the motor was only supported at the site of the flange-type connection. Mr. Randall also testified that a 30–hp motor would weigh somewhere between 20–120 pounds more than the 25–hp model motor used on the baseline purifier.[11] As it was impossible from Westfalia's proposal to determine the exact weight, he gave the opinion that the evaluators could not have reached a reasonable decision as to the effect of the larger motor on the purifier's ability to withstand shock.

On cross-examination defendant directed Mr. Randall to a page of Westfalia's proposal on which it stated that the submitted price included a 30–hp mil-spec motor, the manufacturer of which was expected to be either Louis–Allis or Reliance Electric. Mr. Randall had not examined before this portion

of Westfalia's proposal, nor had he sought to determine how many 30–hp mil-spec motors were manufactured by either of the listed companies.

Because Mr. Randall never examined the relevant military specifications to discern their treatment of motors, it was established that he had never verified that the motors he had referenced in the various commercial catalogues were or were not in accord with the relevant military specifications. Had the military standards been examined, the witness would have been able to make a significantly more informed opinion. The obvious deficiencies in Mr. Randall's analysis of the effect of a heavier motor on the proposed model render his opinion speculative and of questionable probity.[12] In light of the other deficiencies surrounding the witness already articulated, the court discounted his testimony.

### 3) Type I vibration testing

Type I vibration is caused by sources external to the purifier. The military standard governing Type I vibration testing is MIL–STD–167–1. Because Westfalia had yet to produce an OSB–35–02–366 purifier, it sought an extension from MIL–STD–167–1. Westfalia submitted in support of its request a test report for its baseline model, an OSA–35–02–366, and the same information used for shock testing, Attachment A and the design drawings. Just as it had found Westfalia's initial submission insufficient to support an extension for shock testing, the Navy also demanded additional documentation before it would agree to grant an extension for Type I vibration. Westfalia responded to this request in its February 26 letter, which also addressed shock testing. Based on this additional submission and Attachment A, the Navy granted an extension for Type I vibration testing.

In challenging the evaluation board's decision to grant an extension for Type I vibra-

11. Mr. Randall stated that he examined the weights of several 30–hp flange-mounted motors in various commercial catalogues to support this range.

12. Mr. Randall's opinion is also rendered speculative because he failed to take into account the weights of the baseline and proposed purifiers.

He testified that the effect of the motor on both shock and vibration depended to a certain extent on the weight of the purifier. Mr. Randall could not discern the weight of the baseline purifier and failed to take into account the weight of the proposed purifier.

tion testing, plaintiff relied primarily on Mr. Randall. His testimony that the Navy lacked sufficient information to make a reasonable decision as to whether Westfalia was entitled to an extension for Type I vibration relied on the size and weight of the larger motor. The court discounts this testimony for the reasons stated previously.

#### 4) *Airborne noise testing*

The component of the solicitation addressing airborne noise required that an offeror provide test data for the purifier proposed that indicated compliance with MIL–STD–740–1. This standard divides equipment subject to its provisions into several different classifications depending on the location of the equipment on board the ship. In the procurement at issue, the Navy evaluators deemed the purifiers to be Grade D equipment, which, pursuant to the military standard, is permitted the highest noise level.[13] Consequently, the offered purifier had to comply with the maximum decibel levels articulated in Grade D of MIL–STD–740–1.

The RFP also contemplated the granting of an extension if the offeror could demonstrate compliance with a commercial standard known as DIN 45635, Part 1, Class 2.[14] Plaintiff demonstrated at trial that the DIN standard does not provide maximum allowable decibel levels and that the standard merely sets forth guidelines governing the manner in which equipment is to be tested. Due to the absence of maximum allowable decibel levels, plaintiff argued that the DIN option was not independent from the military standard. According to plaintiff, the Navy had to rely on the military standard to provide the maximum allowable decibel level. Following this line of reasoning, if the equipment produced noise levels beyond those found in Grade D of the military standard, the Navy should consider it non-compliant.

Mr. Quinones testified that the DIN and military standards were not interrelated.

Q [By plaintiff's counsel] There's nothing in Paragraph 2.3 [addressing the airborne noise requirement] stating that the data taken by either test does not have to comply with the acceptability criteria of MIL Standard 740–1, isn't that—

A [By Mr. Quinones] No, that's not correct. If you choose to submit documentation in accordance with 740, you would have abide by what 740 requirements are.

If you submitted documentation based on the DIN spec 45635, you will have to abide for what the DIN spec states.

Mr. Quinones next addressed the obvious follow-up inquiry:

Q [By plaintiff's counsel] How did the Navy determine whether an offeror, whether the test data for an offeror using the DIN standard was acceptable?

A [By Mr. Quinones] Well, obviously, for any kind of environment, let it be anything from an office environment to a hostile industry environment, there are OSHA standards that call out for maximum levels that the human ear can first tolerate, and it delineates maximums where the factor of damage inside the ear will start to occur, in accordance with the OSHA standard, and that's basically a standard that's applied across the nation.

When you start exceeding reading sound pressure levels in excess of 85 decibels, you have to start implementing a hearing prevention plan. Once that noise exceeds or gets to 90—or exceeds 90 decibels, you have to implement the plan. So, basically, as long as you're contained under the 85 decibel range, you're okay. It's not anticipated that the human ear will suffer any kind of damage.

So, obviously, the DIN didn't specify limits, but then again, this is where the engineering judgements come into play. We concluded that everybody was, everybody's proposal was acceptable, because they did not exceed that limit of 85.

In fact, Mr. Quinones stated that the evaluators "ran those numbers [submitted by Westfalia] through the octave band and we

---

**13.** The military standard creates ranges of permissible noise levels and labels these ranges A through D. As one moves from A toward D, the permissible decibels increase.

**14.** The DIN standard is a European standard that is roughly equivalent to MIL–STD–740–1 in terms of the testing procedures that it requires.

calculated that number to be way below that [85 decibels]. It stands at about 74 decibels."

The court cannot accept plaintiff's argument that the DIN and military standards are somehow connected to one another. The solicitation stated expressly that offerors could achieve compliance with the airborne noise requirements by meeting either the military standard or the DIN standard. Inclusion of the DIN standard would be redundant if it was utterly dependent on the military standard's maximum allowable decibel levels. Moreover, after reviewing the record, it is apparent that such an interpretation is inconsistent with the development of the solicitation.

In its initial formulation, the RFP made no mention of the DIN standard. Via the November 15, 1996 Amendment 0002, the Navy added the provision at issue. As defendant indicates, prior to Amendment 0002, the RFP required airborne noise testing either in accordance with either military standards or at a level not in excess of "80 DB according to measurement DIN 45635, part 1, class 2." Amendment 0002 deleted the 80 DB maximum and inserted the current provision. With deletion of the maximum decibel level, it was reasonable for the Navy evaluators to use their engineering judgment and apply an 85 decibel cap that is in accordance with OSHA standards.

Plaintiff also takes issue with what it characterizes as the Navy's disregard of the fact that the baseline purifiers have a frame constructed from a different type of iron than that contemplated for the proposed purifier. The baseline OSB–35–02–066 or 566 purifiers [15] have a lower frame constructed of cast

iron. The proposed model will have a lower frame constructed of nodular iron, which is apparently a stronger material that is better able to withstand shock. The crux of plaintiff's contention is that cast iron creates graphite flecks that serve to dampen the noise emanating from the unit. Without taking into account the absence of the noise dampening powers of cast iron, plaintiff postulates that the Navy could not have made a reasonable decision concerning whether Westfalia was entitled to an extension of the airborne noise testing requirement.

Mr. Quinones admitted that the noise dampening characteristics of nodular iron compared with cast iron were beyond his scope of expertise. He also stated that the Navy did not consider the effect of the proposed purifier's having a lower frame constructed of nodular iron vis-a-vis airborne noise. However, Mr. Quinones did point out that the baseline model had a maximum decibel level of 74. He also explained that, although he was aware of the different materials, one cannot "add noise as you add numbers, and in order to increase a noise level to say ten decibels, I would think we would be bleeding through our ears before we get to that level."

To combat Mr. Quinones' assertion that it was verging on impossibility for the lower frame to cause an increase of 10 decibels, plaintiff relies on the testimony of Mr. Randall, who opined that nodular iron is 30% less effective than cast iron at dampening noise, so that the evaluators' failure to take this fact into account was a material omission.[16] Yet, Mr. Randall provided no basis for the 30% figure pertaining to the noise dampening abilities of cast iron, nor did he offer an opinion that the different materials

---

15. Plaintiff has argued that Navy erred in even considering the data submitted by Westfalia because the RFP required data derived from the proposed model. In rejecting this argument, the court has not considered the evidence provided by Klaus Lohmeyer, Westfalia's Director of Marine and Power during the procurement, after the Rule 52(c) motion was granted in part. However, Mr. Quinones testified that the Navy did not construe the term "offered model" or "proposed model" as requiring the same alphanumerical designation as that of the baseline purifier. To do so would frustrate the purpose of the solicitation, which was to convert what had

been a sole-source procurement to competitive bidding by soliciting proposals from manufacturers that produce commercial purifiers. Prior to this procurement, no manufacturer other than plaintiff had ever produced the exact purifier being sought by the Navy.

16. Mr. Randall stated that he derived this figure from his experience as a student at United States Post–Graduate School in Material Sciences. At this institution he studied the differences among differing grades of iron, steel, and aluminum alloys.

would result in the purifier with a nodular iron frame being 30% noisier than a purifier with a cast iron frame. The court defers to the transcript of proceedings for the cross-examination which had the effect of discrediting his testimony, as well as the court's findings on credibility. Mr. Randall did not establish that the panel acted unreasonably by not considering the noise dampening qualities of cast iron.

Westfalia complied with the requirements of the DIN standard as construed by the evaluators. As to the question of whether it was objectively erroneous to fail to calculate the exact numerical effect of a cast iron lower frame as opposed to nodular iron lower frame, plaintiff has failed to meet its burden. Even if Mr. Randall was correct in his assertion that nodular iron is 30% less effective at dampening noise than is cast iron, no evidence was presented that a 30% increase in the decibel level emitted by the OSB–35–02–366 purifier would be created. In short, Mr. Randall did nothing more than raise a question concerning the effect of nodular versus cast iron. As the court noted in rendering its Rule 52(c) ruling, Mr. Randall's "lack of familiarity with the specific device involved, and lack of familiarity with some of the specifics of the Westfalia proposal raising questions, is simply not sufficient. There is a difference between raising questions and pointing out deficiencies, and I think the expert fell short of that."

### 5) *Performance testing*

The final claim for which the court granted defendant's Rule 52(c) motion concerned the performance testing criteria. This criterion required that the proposed purifier process 100 gallons of fuel per minute,[17] although the RFP permitted the granting of an extension in the form of extrapolated test data "submitted demonstrating that the offered Purifier model is capable of handling and processing fuel in accordance with the requirements of the purchase description." Westfalia chose to avail itself of the extension option and submitted to the Navy extrapolated data, derived from an OTA–14–00–066 purifier, indicating that the proposed model OSB–35–02–366 purifier would be able to meet the requirements set forth in the purchase description.

Plaintiff takes issue with this data and contends that they were insufficient to serve as the basis of an extension. As an initial point, the OTA–14–00–066 purifier that was used as the baseline model did not include a device known as a centripetal pump. The lack of a centripetal pump on the baseline model renders the extrapolation data meaningless, plaintiff argues, because the pump makes the geometries on the two purifiers different and serves to create different flow patterns.

On direct examination by plaintiff, Mr. Quinones refuted this argument and asserted that a centripetal pump, which he referred to as a paring disc, had no relevance as to the flow of fuel through the purifier:

Q [By plaintiff's counsel] Doesn't a centripetal pump tend to inhibit the flow of fuel?

A [By Mr. Quinones] What do you mean, inhibit?

Q Slow it down?

A No, you're talking about the centripetal pump, okay, the paring disk. The paring disk, the only thing it does for me is reroutes fuel, clean fuel, to the clean fuel tank aboard ships. That's all it does.

Mr. Quinones also testified that the Navy believed that the shape of the purifiers involved in an extrapolation were irrelevant to the validity of the exercise.

Q [By plaintiff's counsel] Isn't it also true that the evaluators believe that the actual physical shape of the purifier used for the extrapolation is irrelevant?

A [By Mr. Quinones] We believe that, yes.

Mr. Randall disagreed with Mr. Quinones' assessment of the effect of a centripetal pump on the flow patterns of centrifugal purifiers. Mr. Randall took the position that the two purifiers, the OTA–14–00–066 and the OSB–35–02–366, did not have sufficiently similar geometries or flow patterns to support a valid extrapolation. Specifically, Mr. Randall did not believe that Westfalia's tech-

---

17. The criterion also required the purifier to meet certain effluent quality standards.

nical proposal indicated what the geometry and flow pattern was for the OTA–14–00–066 purifier. On questioning by the court, it became evident that the basis of Mr. Randall's opinion devolved to the absence of a centripetal pump in the baseline purifier:

Q [By the court] If we would look at these two configurations, and they were exactly the same as depicted except that we were not even discussing the presence or absence of a centripetal pump, would your opinion be the same, such that the only differences would be the conical or angled shape on the sides and the bottom in Defendant's 16 [the proposed purifier], versus the flat sides and bottom in Defendant's 19 [the baseline puffier]?

A [By Mr. Randall] Yes. It is my opinion they'd be the same.

Thus, Mr. Randall was in direct conflict with Mr. Quinones as to the effect on flow of a centripetal pump.

On cross examination defendant demonstrated convincingly that Mr. Randall's knowledge of centrifugal purifiers was not deep.

Q [By defense counsel] I believe you also said it makes a difference, in terms of the geometry of the unit, whether a unit is self-cleaning or non-self-cleaning?

A [By Mr. Randall] I said, I think it does. I would suspect it does. Yes.

Q Do you know whether it does or not?

A No.

Mr. Randall also was unfamiliar with other terms significant to the extrapolation.

Q [By intervenor's counsel] Mr. Randall, do you know the definition of a solid bowl centrifuge?

A [By Mr. Randall] Do I know the definition of a solid bowl centrifuge? No. I'd have to look it up.

Mr. Randall was next shown the test report submitted by Westfalia to the Navy pertaining to the model OTA–14 purifier. The initial paragraph of this report stated:

On September 14th, 15th, and 16th 1987 the Westfalia model OTA 14 purifier was tested for performance at Westfalia Separator's main works located at in Oelde, West Germany. This high speed, solid bowl, disc type centrifuge in its commercial form is currently being used to purify DFM on the PHM–1 Navy hydrofoil "Pegasus".

Mr. Randall was then questioned as to his use of this report.

Q [By intervenor's counsel] Did you read this report in analyzing the extrapolation data from the OTA14 to the OSB35–02–366?

A [By Mr. Randall] I did read this report, yes.

Q Did you look up the term solid bowl?

A At that time, no.

Q Have you looked it up since?

A No.

Q Sir, do you know how a self-cleaning centrifuge works?

A Not precisely, no.

Mr. Randall's evident lack of familiarity with the manner in which centrifugal purifiers function renders his opinion virtually meaningless as to the effect of a centripetal pump.[18] The witness' lack of expertise with respect to the functioning of the purifiers at issue reduces significantly the credibility of his statements that Westfalia failed to provide sufficient data on which the Navy could rely in granting an extension.

As a second contention, plaintiff asserts that even if the model OTA purifier was a permissible baseline, the extrapolation equations submitted by Westfalia were faulty. The lynchpin of this argument is that the second set of equations, which was submitted in response to the Navy's February 7, 1997 demand for further information, was inaccurate and inconsistent with the initial set of equations. Plaintiff posits that the Navy took it upon itself to correct the equations, thereby rendering a noncompliant proposal compliant.

18. Mr. Randall was not permitted merely to offer a different interpretation of the data than that relied upon by the Navy evaluators. *See supra* note 5. Mr. Randall lacked sufficient expertise with the flow patterns and geometries of centrifugal purifiers to be able to credibly challenge Mr. Quinones on the effect of a centripetal pump.

On direct examination by plaintiff, Mr. Quinones testified that the revised data and supporting equations supplied by Westfalia were sufficient to merit an extension. Mr. Quinones admitted that the equations submitted by Westfalia were incorrect due what he determined to be an obvious typographical error. As an engineer Mr. Quinones stated that he quickly was able to discern the mistake and that, once he had done so, he was able to determine that the actual data provided by Westfalia were correct and had been calculated with the correct equation. Because the data were correct, the court cannot find that the Navy acted unreasonably by correcting the typographical error.

### 2. *Issues decided after trial*

While the court rendered a judgment on partial findings in favor of defendant and intervenor on the majority of outstanding issues, it did permit the case to continue on the issues of Type II vibration testing and compliance with the RFP's market acceptability criteria.

### 1) *Market acceptability criteria*

The primary dispute over the market acceptability criteria centers around the final two criteria. The first of these states that the "company must have produced at least (20) of the model(s) being tendered." The second states: "The item offered must have been sold to the commercial market or the government...." Given that these two criteria are inconsistent with the notion of soliciting purifiers from manufacturers that previously had not sold purifiers to the Navy, the parties disputed vigorously the definition of "model."

Mr. Quinones' testimony persuaded the court that the Navy was not interested in a particular purifier's alphanumerical designation. He explained that the evaluators were aware that the overall purpose of the solicitation was to procure equipment that previously had been sole-sourced. If the evaluators had adopted the narrow definition of "model" suggested by plaintiff—meaning the exact same alphanumerical designation—they would have had no recourse but to obtain the purifiers from plaintiff, as no offeror other than plaintiff had produced purifiers for the Navy. The evaluation panel turned to Webster's Dictionary for a definition of "model" and settled on one stating that a model is an object "representative of the same style, similar in design...." Applying this definition, the panel determined that the model offered referred to Westfalia's OSB–35 series. Mr. Quinones took the position that the final three digits, whether 066, 366, or 566, were irrelevant to exactly what model Westfalia was proposing. In his eyes the final three digits had no relationship whatsoever to the form, fit, and function of the purifier. They merely represented different features of the same purifier. Mr. Quinones provided a thorough explanation of the Navy's interpretation of the market acceptance criteria.[19]

Klaus Lohmeyer, currently Westfalia's Director of After Sales Service, testified in response to a question about the OSB–35–02–366 purifier that the combination of letters and numbers is used by Westfalia to "characterize[ ] the model, the series of the model and the design of this particular model." Mr. Lohmeyer explained the manner in which Westfalia designates its purifiers. The "O" stands for equipment that purifies oil, the "S" indicates that the purifier is self-cleaning, and the final letter designates the series of the purifier within the model. Next, Mr. Lohmeyer stated that the "35" is a mid-range efficiency factor and that the "02" represents "number one, ... a disc stack centrifuge and, number two, it says that this disc stack centrifuge has one single centrifugal point which is being utilized here to discharge the already cleaned fuel out of the centrifuge." Finally, Mr. Lohmeyer pointed out that the final three digits indicate specific features of a particular purifier. For example, those with the designation "366" are shock proof and those designated "566" are explosion proof.

---

**19.** Mr. Quinones' testimony also was consistent with the fact that the solicitation contemplated extensions for any or all of the mandatory requirements. The entire portion of the solicitation discussing extrapolating from baseline models would be rendered meaningless if offerors were required to have produced the purifier that they were proposing.

After explaining the designation system, Mr. Lohmeyer was questioned as to exactly what constitutes a model:

Q [By the Court] Now, you use the word model throughout. You talk about your model.

A We use the word model only for a particular purifier or for a series of purifiers.

Q Give me an example. I am looking at these letters and digits. Tell me what the model is, if you would, that you were just discussing.

A When you look at an OSB, for instance, the OSB by itself is not enough to classify this as a model. It has to be at least an OSB 35 because that is the size of the purifier.

We would say a model is the OS blank 35. That would be a model. It could be an OSA, or it could be an OSB. We consider this as the same model because it is the same machine.

Q So an OS, whether it is an A or B, is the same machine?

A In this case, yes.

. . . .

Q [By intervenor's counsel] From Westfalia's standpoint, do you consider the OSA 35–02–366 and the OSB 35–02–366 to be the same model?

A Absolutely. It is the same model. Even the OSA 35–02–066 compared to the OSB 35–02–366 is the same model. There is no difference. There are only improvements being made from the OSA to the OSB.

Mr. Lohmeyer's clear and cogent testimony supplements that of Mr. Quinones, who repeatedly testified that it would have been unreasonable for the Navy to base its decision regarding the market acceptability criteria solely on a purifier's alphanumeric designation. On this basis, when Westfalia responded to the criterion requiring the production of at least 20 of the offered model that it had "24 OSA 35–02–366 (shock design) purifiers presently operating onboard 12 of Canada's newest patrol frigates," it was responsive. Westfalia's state-

ment that the Military Sealift Command operates 20 OSA–35–02–066 purifiers and 35 OSB–35–02–066 purifiers was responsive to the fourth criterion.

### 2) *Type II vibration*

The RFP, ¶ 2.2.1, contained a mandatory requirement with respect to Type II, or self-induced, vibration: "Vibration test data shall be provided by the manufacturer in accordance with the requirements of MIL–STD–167–1, Type I and Type II. . . ." Section 5.2.2.3 of the military standard required that measurements be taken to verify that specified values are not exceeded. Paragraph 2.2.1.a of the RFP allowed offerors to avail themselves of an extension from Type II vibration testing requirements if they presented the Navy with "[c]omplete engineering design documentation demonstrating that the redesigned model is capable of withstanding. internally . . . induced vibration. . . ."

Before addressing the question of whether or not Westfalia provided the Navy with sufficient information to support the grant of an extension for Type II vibration testing, it is essential to understand the technical evaluation panel's view of the requirement. Mr. Quinones testified that, in preparing the solicitation at issue, the Navy was attempting to bring its procurement system into accord with the reality of limited budgets and legislation such as the Federal Acquisition Streamlining Act of 1994.[20] As Mr. Quinones aptly described the circumstances: "The intent was not to subject the offeror to the scrutiny of the Navy testing they are accustomed to. This is basically establishing a new path of the Navy doing business."

Prior to drafting the solicitation, the evaluators searched in vain for a commercial standard governing vibration. Because they were unable to identify a single useful commercial standard, their command directed the panel to rely on the previously used military standard, in this case, MIL–STD–167–1. It is undisputed that the military standard calls for both Type I and Type II testing. Thus, the Navy found itself bound

---

**20.** *See supra* note 2.

by a standard more encompassing than it deemed necessary, *i.e.*, the solicitation required Type II testing, although the technical evaluation panel concluded that such a requirement was inappropriate for the procurement at issue.

Plaintiff contends, and the court agrees, that regardless of the panel's view of the appropriateness of the standard, the Navy is strictly bound by its terms. Although the evaluators may have found Westfalia's proposal technically compliant, plaintiff argues that in doing so the panel deviated from the solicitation's requirements, thus rendering the contract award in violation of both an applicable procurement statute and a regulation.

"The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1) (1994). Federal Acquisition Regulation (FAR) § 15.606(a), (c), 48 C.F.R. § 15.606(a), (c) (1996), provides:

(a) When, either before or after receipt of proposals, the Government changes, relaxes, increases, or otherwise modifies its requirements, the contracting officer shall issue a written amendment to the solicitation.

. . . .

(c) If the proposal considered to be most advantageous to the Government (as determined according to the established evaluation criteria) involves a departure from the stated requirements, the contracting officer shall provide all offerors an opportunity to submit new or amended proposals on the basis of the revised requirements....

Mr. Quinones conceded that Westfalia did not submit test results:

Q [By plaintiff's counsel] Now, with regard to Type II vibration, in fact, Westfalia provided [no] Type II vibration test data at all, did they.

A [By Mr. Quinones] Numbers, as far as numbers in a chart or whatever, they did not. They did provide a test procedure, and they did provide an intent to comply with the requirements from the 167 [the applicable military standard]. They also have to perform other tests, other Type II testing on their machines, and they referenced that, also.

In order to prevail plaintiff must demonstrate the presence of a clear and prejudicial violation of an applicable procurement statute or regulation. *Central Arkansas Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995); *CACI Field Servs.,* 854 F.2d at 466. Defendant's position is that Westfalia submitted sufficient engineering design documentation, although admittedly not in the form of numbers or a chart, to convince the evaluators that its proposal was technically compliant.

Mr. Quinones proffered several justifications for this position. First, Type II testing was the simplest of all of the tests required by the solicitation and had to be performed on each and every unit to be delivered to the Navy. Even after each unit was delivered, the test would be performed on a recurrent basis. Second, the purchase description required each unit to be equipped with a vibration safety interlock, which would shut a down a purifier if it was vibrating excessively. Third, Westfalia committed itself to provide Type II test data after being awarded the contract and "confirmed" that its purifiers were compliant. Fourth, Westfalia stated that during the required spin test of each purifier, it would measure and supply with each unit "various operating parameters such as centrifuge speed, flow, operating current, vibration, etc." Fifth, Westfalia provided an independent test report concluding that a baseline purifier had met the requirements of the applicable military standard. Finally, Westfalia submitted engineering drawings indicating the appropriate testing points from which Type II measurements would be taken.

The court finds that each of the justifications enunciated by Mr. Quinones are seriously flawed. The vibration test report submitted by Westfalia indicated that an OSA 35–02–366 purifier had complied with MIL–STD–167–1. Mr. Quinones testified that this report sufficed to demonstrate compliance with the solicitation's Type II vibration requirement. The rationale behind Mr. Quinones' testimony is that if the OSA 35–02–

366 purifier complied with MIL–STD 167–1, and, if the OSA 35–02–366 purifier is a baseline for the proposed purifier, the data from test can be extrapolated to the proposed purifier for the purpose of granting an extension from Type II testing.

Although this logic appears initially persuasive, plaintiff demonstrated that the description of the tests performed by the independent laboratory were applicable to Type I, not Type II vibration:

Q [By plaintiff's counsel] These three pages [of the report] are vibration test data sheets, are they not?

A [By Mr. Quinones] Yes, that's what they look like.

Q And they record measurements of vibrating the unit along the three axis, vertical, front to back and side to side. Is that not correct?

A I see vertical, front to back, side to side.

Q And that is the way a Type I vibration test would be conducted, would it not?

. . . .

A That's what the spec [MIL–STD–167–1] says. Yes, sir.

Q There is not any data in this . . . report showing the kinds of results that you would get from a Type II test, is there?

A I don't see any results there.

It also appears that Westfalia was aware of the report's shortcomings with respect to Type II testing when it submitted its proposal. In Westfalia's request for an extension from Type I vibration testing, it referenced the data contained in the independent report, although Westfalia did not rely on this report in its effort to obtain an extension from Type II testing. This report cannot serve as the basis for finding Westfalia's proposal technically compliant as to Type II testing.

Mr. Quinones also testified that the purchase description required each offeror to perform a spin test on each fully manufactured purifier. As part of this required test, the manufacturer was required to conduct certain tests and record the results; these tests included one for vibration. It was unreasonable for the evaluators to rely on this spin test as indicating compliance with the

Type II vibration requirement. Because the purchase description states expressly that the spin test is a post-award procedure, the future performance of the test cannot, in and of itself, serve as the basis for granting an extension from Type II testing.

The Navy also required that an offeror provide a safeguard mechanism that would protect a purifier from excessive self-induced vibration. This mechanism is known as a vibration safety interlock and serves automatically to shut down a purifier that is vibrating excessively. According to Mr. Quinones, the presence of this interlock ensures that the purifiers obtained by the Navy will not exceed the acceptable limits set forth in MIL–STD–167–1. Plaintiff took issue with this assumption on the ground that the purchase description did not require that the interlock be calibrated to a level at or below the maximum amplitude allowed by the standard. Mr. Quinones countered that it would be nonsensical for an offeror to supply an interlock that permitted vibration beyond the level permitted by the military standard governing the procurement.

The court agrees with Mr. Quinones that it would be pointless for a manufacturer to equip the purifiers with a safety interlock calibrated to a level above that permitted by the applicable military standard. However, it would also be absurd if these safety interlocks were repeatedly activated by purifiers that for whatever reason continually exceed permissible Type II vibration levels. The Navy emphasized that these purifiers will be used in high-stress environments. A purifier that is constantly being shut down by its safety interlock for excessive vibration will be of little benefit to the Navy. Even if Mr. Quinones' explanation were deemed reasonable, the presence of a safety interlock on each purifier does not excuse Westphalia's failure to submit the test results that the specification mandated.

Mr. Quinones also articulated that Type II testing was different from the other requirements in that it was a recurrent test that had to be performed on each purifier. Even if an offeror provided a chart demonstrating that its baseline purifier was in compliance with

MIL–STD–167–1, that was no guarantee that a particular machine would be acceptable to the Navy. Self-induced vibration is caused primarily by either a purifier's having "bad" bearings or a misaligned motor. Over the course of its service on board a Navy destroyer, a purifier, from time to time, could fail to comply with Type II vibration guidelines because of the occurrence of either of these two circumstances. It is for this reason that Type II testing is performed on a recurrent basis.

In the event of such noncompliance, caused, for example, by worn bearings, the Navy simply will insert new bearings, assure compliance with the Type II parameters, and reinitiate the purifier. Mr. Quinones therefore stressed the importance of the evaluators being provided with detailed knowledge of the purifier's Type II measuring points, the alignment of the motor vis-a-vis the horizontal shaft, and the kind and quality of the bearings used in the machine. With this in-depth knowledge of the proposed purifier, Mr. Quinones felt himself to be in a position to exercise his engineering judgment and to find Westfalia technically compliant.

In sum, Mr. Quinones maintained that having been provided with detailed knowledge of the manner in which the purifiers were constructed and given the simplicity and recurring nature of the test, the evaluators acted within their discretion by considering documentation that plaintiff characterized as accepted only "on faith." This documentation took the form of a memorandum stating that Westfalia had recalculated results from an OSA–20 purifier indicating that the proposed purifier would comply with the Type II vibration requirements,[21] Westfalia's commitment to conduct Type II testing post-award, and its confirmation that the proposed purifiers were compliant. Mr. Quinones agreed with the court's summary of exactly what "data" the evaluators relied upon:

> So what you relied on is data including the statements on page 442 [the request for an extension], the way that the drawings looked in terms of how the model was going to be built, your knowledge of the bearings that were going to be used, that these guys [Westfalia] knew what they were going to be doing and that the company was committed to perform Type II testing, and that they had conducted the tests in the past.

What the panel lacked was a set of measurements, information in "black and white," as Mr. Quinones phrased it demonstrating compliance with the solicitation's Type II testing requirements.[22] MIL–STD–167–1 nonetheless expressly requires a set of measurements indicating that Type II vibration does not exceed maximum allowable levels. Despite this shortcoming in the justifications relied upon by the technical review panel, the court is loath to discount the entire evaluative process.

21. At trial plaintiff elicited a response from Mr. Quinones suggesting that his memory of exactly when he became aware of this memorandum is somewhat inconsistent with his deposition testimony. Nonetheless, the memorandum was prepared prior to contract award and was included in the administrative record as an attachment to Westfalia's proposal.

22. Intervenor proffered the testimony of Gunter Pautsch, Westfalia's Director of Design and Manufacturing, who testified that at the time it submitted its proposal, Westfalia had Type II testing information derived from a baseline purifier showing results that were well within the amplitude levels permitted by MIL–STD–167–1. This information was not provided to the Navy because at the time the proposal was prepared no one could remember that it was available. The court permitted intervenor to elicit this testimony subject to plaintiffs motion to strike.

Defendant and intervenor contend that the court is not bound by the strict confines of the administrative record. See GraphicData, 37 Fed. Cl. at 779. Specifically, they assert that a court may allow supplementation of the administrative record when post hoc evidence indicates whether an agency decision was correct. At issue in this controversy is whether the panel could consider information other than test results. Mr. Pautsch's testimony merely serves to illustrate that such test results were extant when Westfalia submitted its proposal. Admitting this evidence does not assist defendant and intervenor in their efforts to prove the adequacy of the information available to the evaluators at the time technical acceptability was determined. What it does demonstrate is that, in response to the Navy's query during discussions, Westfalia could have corrected the deficiency. See FAR § 15.610(c) (requiring that discussions must allow an opportunity to correct any such deficiencies in its proposal). Plaintiffs motion to strike is denied.

As Judge Futey explained recently: "Decisions as to the adequacy of the information presented in a proposal are, however, rightfully left to the discretion of the evaluators, especially where, as here, the decisions are technical in nature." *Aero Corp., S.A. v. United States*, 38 Fed.Cl. 739, 763 (1997). This admonition is particularly applicable to the procurement at issue, which incorporated the concept of extensions from mandatory requirements. The technical review panel was required to exercise a great deal more discretion than in a typical procurement. Moreover, it is a basic tenant of procurement law that a court is to limit its involvement in the procurement process and intervene only in the most limited of circumstances. *See Parcel 49C Ltd. Partnership*, 31 F.3d at 1153 (citing *United States v. John C. Grimberg*, 702 F.2d 1362, 1372 (Fed.Cir.1983) (en banc)). This maxim is particularly true in a negotiated procurement. *See Burroughs Corp.*, 223 Ct.Cl. at 65, 617 F.2d at 597–98.

In the case at bar, the evaluation panel was engaged in technical work requiring an exceptionally high degree of expertise in mechanical engineering. The four members of the panel spent in excess of 100 hours over the course of four to five weeks conducting what the record reveals to be an extremely thorough, multi-faceted technical evaluation. The court cannot find that the evaluators were any less thorough when it came time to determine if Westfalia's proposal was deserving of an extension from Type II vibration testing.

The court is also cognizant that Mr. Quinones and the other evaluators knew they were bound by the military standard and that it did not contemplate a waiver of any of its requirements. "[T]he scope [of the military standard] merely states testing Type I and Type II vibration, so as test engineers, we can play around with, if you will, with the different details within the spec, but we cannot deviate from the scope of the spec." Mr. Quinones reiterated that the panel did not plan to deviate from the scope of the military standard in explaining that "[e]ven though we did not consider Type II from an engineering standpoint to be critical in the way the purchase description was outlined, we

could not omit it because we would be violating the scope of the specification." He testified:

As technical authority, we can work around, if you will, details or maybe omit details, but by no means are we allowed to deviate from the scope. Our higher authority said we had to use 167. The scope of 167 asks or requires no waivers whatsoever and on top of that requires Type I and Type II vibration, so we had to ask for Type II.

When the solicitations came in and we evaluated them, obviously as far as acceptance or technical acceptance for the solicitations we were the authority. We were basically named to look over the evaluations and say or establish or conclude what was acceptable and what was not.

Since Type II vibration, like I established before, is such a simple test and is done very extremely often, I did not consider that it was a weight of magnitude say for shock or Type I vibration or airborne testing or performance. we discussed that among the evaluators, and everybody agreed to it.

The sum of Mr. Quinones' testimony was that the data Westfalia presented constituted sufficient comparable indices of conformance with the specification. Thus, the question before the court devolves to a determination of whether this information is sufficient to replace the measurements demonstrating compliance required by MIL–STD–167–1. Mr. Quinones testified over two days, affording the court a protracted opportunity to assess his demeanor and credibility. Although the court found Mr. Quinones to be a competent and persuasive witness, it cannot avoid finding that the evaluation panel did just what Mr. Quinones said it could not. The panel deviated from the scope of MIL–STD–167–1 by waiving for Westfalia that portion of the standard expressly calling for measurements of amplitude of vibration. The court is reluctantly obligated to find that by subsequently awarding the contract to Westfalia, NAVICP violated a clearly appli-

cable procurement statute and regulation.[23] *See Central Arkansas,* 68 F.3d at 1342.

 Having established a clear violation of an applicable procurement statute and regulation, plaintiff must also demonstrate prejudice. *See CACI Field Servs.,* 854 F.2d at 466. The federal circuit teaches that prejudice will be found if a reasonable likelihood is present that the aggrieved party would have received the contract in the absence of agency wrongdoing. *See Data General Corp. v. Johnson,* 78 F.3d 1556, 1563 (Fed.Cir. 1996).

In reviewing the proposals for technical compliance, the evaluators were under the erroneous impression that the test results provided by plaintiff failed to indicate compliance with the Type II testing requirement. At trial plaintiff presented a witness who testified that the Navy had erred in finding plaintiff non-compliant. Defendant and intervenor subsequently conceded in their post-trial briefs that the technical evaluation panel had committed a mathematical error. Even so, defendant and intervenor argue that the evaluators' error suggests that plaintiff and Westfalia were evaluated according to the same relaxed standard with respect to Type II testing, so that neither offeror was prejudiced.

This argument is unpersuasive. Mr. Quinones testified that, despite the apparent deficiency in plaintiff's offers, the evaluators had found plaintiff technically acceptable with respect to the Type II testing. As an initial point, the distinguishing factor in this decision is that the evaluators had some test results on which to base the application of their engineering judgment. Conversely, the decision to find Westfalia technically acceptable was not based on any test results whatsoever.

Moreover, the evaluators' analysis of plaintiff's test results was flawed. Had the evaluators correctly analyzed the data submitted by plaintiff, they would have found themselves in the position of having one offeror irrefutably compliant and another requiring significant benefit of the doubt—unsupported by any test measurements—to be found technically acceptable. The decision to find Westfalia technically acceptable in view of the failure to comply with a mandatory requirement of the solicitation prejudiced plaintiff to some extent, but not enough to establish a reasonable likelihood that plaintiff would have been awarded the contract. This finding is based on considerations of price.

Plaintiff's position rests on the fact that only two offerors submitted proposals—Westfalia and plaintiff. Had Westfalia been found technically unacceptable, plaintiff postulates a reasonable likelihood that it would have received the contract. Plaintiff's contention disregards the colossal price difference between even its lowest priced offer and that of Westfalia—a difference of over $5 million. The Navy retained the option to cancel the solicitation and recompete the contract. *See Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 577, 492 F.2d 1200, 1205 (1974).[24] Plaintiff's offer to replace the antiquated purifiers for $18.9 million precipitated the Navy's decision to abandon its sole-source procurement for competition. Despite the benefit of knowing already what price the Navy considered to be too high, plaintiff's lowest offer quoted a price of $19.4 million—an even higher price than that rejected previously by the Navy—and 29.56% higher than Westfalia's proposal.

 Significant price differential militates against finding prejudice. In *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34 (1997), Judge Yock found that

---

**23.** Defendant has urged the court to reject plaintiff's protest by means of adopting a *de minimis* standard. Even if the court were to view failure to comply with a mandatory requirement *de minimis,* it could not employ such a standard because the Federal Circuit has never adopted such an approach for the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994). *See, e.g., Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990 (Fed.Cir.1996) (applying *de minimis* rule under the Brooks Act, 40 U.S.C. § 759(f)(5)(B), which allowed the

agency board discretion in deciding if violation of mandatory requirement merited relief); *Andersen Consulting v. United States,* 959 F.2d 929 (Fed.Cir.1992) (same).

**24.** A cancellation without recompetition is unlikely. Through Mr. Quinones the Navy has indicated that this procurement is mission critical to the destroyer fleet.

an offeror's considerably more expensive proposal,—$4.5 million, or 35%, more than the prevailing offeror—precluded the court from finding prejudice as there was not a reasonable likelihood of receiving the contract absent the alleged improprieties. 39 Fed.Cl. at 54, n. 19 (citing *Data General,* 78 F.3d at 1563; *McDonald–Bradley,* 96–1 CPD ¶ 54, at 3).

In *Data General* the Federal Circuit approved the use of price differential as a factor in determining the presence of prejudice. Quoting extensively from a board decision; the court instructed that a disappointed offeror that has made a business judgment to propose an expensive product cannot utilize the protest system to obtain the proverbial second bite at the apple. 78 F.3d at 1564 (citing *Fortran Corp.,* GSBCA No. 12952–P, 1994 BPD ¶ 245, at 7). Knowing that the Navy already had rejected its sole-source offer of $18.9 million, plaintiff opted nonetheless to propose an even higher price in a competitive environment. The price disparity renders it impossible for the court to find prejudice.

### 3. *Other showings for injunctive relief*

■ In addition to demonstrating the presence of an unreasonable action or violation of an applicable procurement statute or regulation, plaintiff must make three additional showings: 1) that failure to enjoin the procurement will cause plaintiff to suffer specific and irreparable harm; 2) that such harm to plaintiff outweighs that which would be incurred by the Government and third parties should plaintiff prevail; and 3) that the grant of injunctive relief is in the public interest. *See Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 795 (1991).

■ Plaintiff has established that it would suffer irreparable harm were it not to receive injunctive relief because it would lose the profits associated with the instant contract. Absent injunctive relief, plaintiff would have only the legal remedy of seeking recovery of its proposal preparation costs. *See Quality Transp. Servs., Inc. v. United*

*States,* 12 Cl.Ct. 276, 282 (1987) (citing *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1302 (D.C.Cir.1971)). Were the court to grant plaintiff relief, however, both the Government and intervenor would suffer harm. Intervenor would be prejudiced by having already begun performance and having dedicated certain aspects of its production capability to performing this contract. The Government would be required to terminate the extant contract for convenience and subsequently reprocure the purifiers. The court views the harm to all parties as equal.

As to the final factor, whether granting injunctive relief is in the public interest, the parties proffer robust arguments. The public has a strong interest in assuring that the integrity of the procurement laws are preserved—both in letter and spirit. *See Parcel 49C Ltd. Partnership,* 31 F.3d at 1153. Allowing the Government to deviate from mandatory specifications does not comport with this goal. On the other hand, defendant demonstrated that the Navy destroyers, as a fleet, for which these purifiers are intended currently are unable to function at their full capability. This procurement, as characterized by Mr. Quinones, is mission critical. Until the purifiers are replaced, the Navy will not be at its highest degree of readiness. *See DLM & A. Inc. v. United States,* 6 Cl.Ct. 329, 337 (1984) (discussing importance of national defense). Moreover, were the court to order that the Government not perform this contract with any offeror other than plaintiff, the public fisc would suffer because plaintiff's lowest price alternative was $5 million more than Westfalia's. Although the public has an interest in assuring the integrity of the procurement process, it also has an interest in "minimizing the cost of federal procurements." *Vanguard Sec., Inc. v. United States,* 20 Cl.Ct. 90, 113 (1990).

### CONCLUSION

Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment for defendant and intervenor.[25]

---

**25.** All other arguments made by plaintiff that are not discussed specifically have been considered carefully and found to be without merit.